ATLANTIC RICHFIELD COMPANY, d/b/a ARCO Oil and Gas Company, a Division of Atlantic Richfield Company, Appellant,

v.

ANR PIPELINE COMPANY, Appellee.

No. A14–87–00958–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 2, 1989.

**778**

Harrell Feldt, Raybourne Thompson, Jr., Robert M. Schick, Marie R. Yeates, Houston, for appellant.

Thomas R. McDade, Roger D. Townsend, William R. Pakalka, William P. Maines, Houston, for appellee.

Before J. CURTISS BROWN, C.J., and MURPHY and ROBERTSON, JJ.

## OPINION

ROBERTSON, Justice.

This appeal is from a take nothing judgment entered on jury findings in a breach of contract action to recover some $42 million in take-or-pay deficiency payments over a four year period under four natural gas purchase contracts. Appellant insists that the court erroneously had the jury construe the agreements. We agree. Because our construction of the contracts comports with the verdict and judgment, however, we affirm.

### I. FACTUAL BACKGROUND

ARCO, a gas producer, sued ANR, an interstate national gas pipeline, for breach of contract. ARCO alleged that ANR owed $42 million in take-or-pay deficiency payments under four contracts. The four contracts in question were the West Cameron 601 Contract, the Brazos Block 451 Contract, the High Island Block A–563 Contract and the Eugene Island Block 208 Contract. ARCO alleged deficiency payments under the West Cameron and Brazos contracts for the years 1983 through 1986 and deficiency payments under the High Island and Eugene Island contracts for 1985 through 1986. ARCO also sought declaratory relief regarding 30 other contracts—all of the 34 contracts having virtually identical terms. The parties stipulated that the contracts were unambiguous and agreed that this was a simple contract interpretation case. However, they disagreed about the proper interpretation of the contracts on three major points: those provisions concerning (1) royalty, (2) option to reduce the daily contract quantity and (3) force majeure.

Basically, each contract provided ANR would purchase "subject to the other provisions of this Agreement ... during each accounting year the sum of the daily contract quantities" of natural gas. The daily contract quantity was computed on the basis of a percentage of the reserves and was not in dispute. What was in dispute, however, was the "adjusted" daily contract quantities which formed the basis for the final accounting. Each contract provided

that if the daily contract quantity was available but not taken by ANR, ANR nevertheless had to pay. At the end of each accounting year the annual contract quantity was computed and the total quantity of gas actually taken was determined. It is for the amounts of gas that ANR had not taken but for which ARCO contended it was owed that ARCO sought payment for in this suit. As stated above, this controversy concerns the interpretation of three provisions of each of the contracts: royalty, option to reduce daily contract quantities and force majeure. The interpretation of these provisions determines the "adjusted" daily contract quantity.

Each of the contracts contained a "Reservations of Seller" provision, the applicable portion of which provided:

Seller hereby expressly reserves and excepts from the terms of this Agreement such portion of the gas produced from the reservoirs subject to this Agreement as Seller's lessor may be entitled to take or receive under the terms of Seller's leases....

Each also provided for an "option to reduce the daily contract quantity:"

In the event Seller fails to deliver the volumes requested by Buyer up to one hundred eleven (111) percent of the applicable daily contract quantity for five (5) consecutive days, then at Buyer's option, commencing with the first day of the month following the end of the fifth day of such failure to deliver and continuing thereafter until adjusted as hereinafter provided, the applicable daily contract quantity may be reduced to ninety (90) percent of the average daily volumes delivered during such five day period.

In the event the daily contract quantity is adjusted downward as provided in this Section 4, then Seller shall have the opportunity to restore all or a portion of such daily contract quantity by written request to Buyer to conduct a deliverability test; provided, however, if as a result of such test the daily contract quantity is not restored to the daily contract quantity in effect prior to such downward adjustment, Seller shall not be permitted

for a period of ninety (90) days following the completion of such test to request Buyer to conduct a subsequent test. It is further provided that upon receipt of notice from Seller that the inability to deliver gas well gas has been remedied, Buyer may, in lieu of conducting such test, notify Seller that commencing with the first day of the month following receipt of said notice from Seller, the downward adjustment in the daily contract quantity as provided in this Section 4 shall no longer be effective.

The third provision of each contract about which there was a dispute was the force majeure clause:

If either Buyer or Seller is rendered unable, wholly or in part, by force majeure or any other cause of any kind not reasonably within such party's control to perform or comply with any obligation or condition of this Agreement, upon giving notice and reasonably full particulars to the other party such obligation or condition shall be suspended during the continuance of the inability so caused and such party shall be relieved of liability and shall suffer no prejudice for failure to perform the same during such period; provided obligations to make payments then due for gas delivered hereunder shall not be suspended and the cause of suspension (other than strikes or lockouts) shall be remedied so far as possible with reasonable dispatch. Settlement of strikes and lockouts shall be wholly within the discretion of the party having the difficulty. The term "force majeure" shall include, without limitation by the following enumeration, acts of God and the public enemy, the elements, fire accidents, break-downs, shut-downs for purposes of necessary repairs, relocation or construction of facilities, breakage or accidents to wells, machinery or lines of pipe, the necessity of making repairs or alterations to machinery or lines of pipe, inability to obtain materials, supplies, permits, or labor to perform or comply with any obligation or condition of this Agreement, strikes and any other industrial, civil or public disturbance, any act or omission (including failure to take

gas) of a purchaser of substantial quantities of gas from Buyer which is excused by any event or occurrence of the character herein defined as constituting force majeure, and any laws, orders, rules, regulations, acts or restraints of any government or governmental body or authority, civil or military.

Further, Article V, section 8 provided:

Notwithstanding anything to the contrary contained herein, on any day when deliveries or takes are affected by force majeure and the volumes of gas well gas delivered are less than the applicable daily contract quantity, the daily contract quantity hereunder shall be deemed to be the actual volume delivered and purchased on each such day.

The case was submitted to the jury on a total of eight questions—two questions pertaining to each of the four contracts in question for each of the years the contract was in force. Questions 1, 3, 5 and 7 inquired whether "ANR has failed to comply with the 'take-or-pay' provisions of (the named contract) for the following years and that such failure, if any, was not excused by any provision of said contract?" Questions 2, 4, 6 and 8 inquired of the amount due and owing to ARCO as a result of ANR's failure to comply with the take-or-pay provision of each respective contract for each respective period of time. The jury failed to find noncompliance or damages.

## II. The Merits

In its first and second points of error appellant contends it was entitled to judgment as a matter of law. Appellant correctly argues that since neither it nor ANR claimed any ambiguity in the gas purchase contracts, the interpretation of the contracts was for the trial court alone.

Appellant's contention that it was entitled to judgment as a matter of law is based upon its interpretation of these three provisions of the contract in dispute. Appellant argues that since "the three contract interpretation issues (i.e. royalty, 'option' to reduce DCQ and force majeure) determined the calculation of the amount

of the take-or-pay deficiency owed under the contract ... there is only one way that the jury could have reached its verdict—*the jury must have accepted ANR's hindsight contention on the three contract interpretation issues.*" Appellant's Brief at 32 (emphasis in original).

We first address the force majeure provision, since if it is applicable to reduce the daily contract quantities, it would affect all take-or-pay obligations after June 1, 1985, the effective date of Federal Energy Regulatory Commission (FERC) Order No. 380. ANR claimed that FERC Order No. 380 constituted force majeure under the contracts and thereby decreased its daily contract quantity.[1]

Appellant contends that as a matter of law Order No. 380 did not render either MichCon or ANR "unable," within the meaning of the force majeure clause, to comply with the provisions of the contracts. In support of its contention appellant cites a number of opinions, apparently unreported, where various courts have refused to recognize that a decline in sales constitutes an event of force majeure. In only one of the cases, *Hunt Oil Company v. ANR Pipeline Company,* No. 86–6314 J, slip op. (15th J.Dist.Ct., Parish of Lafayette, La. March 13, 1987) was the court concerned with both a force majeure provision virtually identical to the one before us *and* FERC Order No. 380 which was claimed to constitute force majeure. There the district judge did, consistent with appellant's present argument, find:

> Since Michigan Consolidated has not been subjected to any force majeure elements, and since the FERC regulation in question does not specifically prohibit ANR from taking gas from Hunt as specified in the contract, no force maj-

eure has taken place and ANR is obligated to take gas from Hunt under its contract.

That opinion was, however, rendered in connection with the grant of a temporary injunction where the court was plainly balancing the equities in order to maintain the status quo. Under these circumstances its precedential value upon an adjudication of the issue on the trial on the merits of a case is slight. *See Matlock v. Data Processing Sec., Inc.,* 607 S.W.2d 946, 951 (Tex.Civ.App.—Fort Worth 1980), *aff'd as modified on other grounds,* 618 S.W.2d 327 (Tex.1981).

On the other hand, under an almost identical force majeure provision, the federal district court for the northern district of Oklahoma recently held that FERC Order No. 380 is an act of force majeure within the definition of that term in the contract and that whether ANR had been rendered "unable, wholly or in part, by force majeure" was a question of fact to be determined by the trier of fact. *Burkhart Petroleum Corp. v. ANR Pipeline Co.,* No. 87–C–257–C (N.D.Okla. June 30, 1988).

We agree with this reasoning. Here the parties were at liberty to define force majeure in whatever manner they desired. They accordingly agreed that the term force majeure included any act (including the failure to take gas) of a purchaser of substantial quantities of gas from ANR which is excused by any event constituting force majeure *and* any orders or regulations of any governmental body. It is undisputed that MichCon was a purchaser of substantial quantities of gas from ANR and that FERC Order No. 380 was a regulation of a governmental body. Given these facts, it was a question of fact

---

1. ANR buys gas from producers like ARCO and transports the gas through its pipelines to its market area in Michigan and Wisconsin where it sells that gas to local distribution companies, which in turn sells that gas to the ultimate consumers. ANR's major customer was Michigan Consolidated Gas Company (MichCon). The rates at which ANR could sell gas to MichCon were regulated by FERC.

Prior to Order 380 the FERC had approved a rate structure for ANR somewhat similar to the

take-or-pay provision of ANR and ARCO's contract, i.e. MichCon actually to pay for a minimum quantity of gas regardless of whether MichCon actually took that gas. Order 380 changed this procedure and provided that MichCon did not have to pay for the gas not taken and permitted it to purchase gas from cheaper markets. As a result, MichCon was released from its obligation to take and pay for some 210 billion cubic feet of gas from ANR.

for the jury whether these admitted events rendered ANR "unable, wholly or in part" to comply with the obligation of the contracts.

■ Next, appellant contends that the failure of the jury to find take-or-pay liability for the period of time before June 1, 1985 (the date when force majeure reduced the daily contract quantity) means that the jury *necessarily* must have accepted ANR's interpretation of the royalty issue and/or the DCQ 'option' reduction issue. Appellant's Brief at 32 (emphasis in original). Each of the four contracts forming the basis of this controversy involves properties on the outer continental shelf and ARCO had leased the mineral rights from the federal government. Under each lease the federal government reserved a one-sixth royalty which it could elect to take "in kind," i.e. it could take one-sixth of the gas produced. If the government does not take gas in kind, the lease obligated ARCO to sell the gas attributable to the royalty interest and pay the proceeds to the government.

As quoted above, the contracts expressly reserve and except from the terms of the agreement "such portions of the gas produced from the reservoir ... as Seller's lessor may be entitled to take or receive under the terms of Seller's leases." Appellant contends that the reference to "such portions of the gas produced" must refer to the gas the federal government elects to take in kind. Thus, appellant argues, gas is excluded from the contract under this reservation only if the government elects to take its royalty by taking gas "in kind." We do not agree. To place the construction of the reservation as advanced by appellant would significantly change the clear and unambiguous terms thereof. Both appellant and appellee are large and sophisticated energy companies, free to contract as they desire. It is not the function of the court to rewrite their agreement. The trial court properly construed this reservations clause.

Appellant effectively concedes that if the trial court properly interpreted either the royalty issue *or* the option reduction issue,

the jury necessarily must have given effect to that interpretation in order to find no take-or-pay liability for the period of time prior to June 1, 1985. In view of appellant's position and our holding concerning the royalty issue, we do not find it necessary to address the option reduction issue. We therefore hold the trial court properly construed the contracts and denied appellant's motions which, as a matter of law, would have granted it judgment. Appellant's first two points are overruled.

In appellant's third point of error it complains that the trial court erred in denying declaratory relief under the other 30 contracts. The fourth point of error contends that since appellant was entitled as a matter of law to prevail on its contract claim, it was also entitled as a matter of law to its attorneys fees. Appellant makes no argument nor cites any authority in support of either point; hence both points are waived. *King v. Graham Holding Company, Inc.*, 762 S.W.2d 296 (Tex.App.—Houston [14th Dist.] 1988, no writ.) These points are overruled.

■ In the next two points of error appellant complains that the jury's answers to each of the eight questions are against the great weight and preponderance of the evidence and that the jury's zero damage findings are grossly inadequate. In argument under the points appellant states:

The only evidence supporting this verdict is ANR's own muddled attempts to construe the contracts by reading express contract terms out of those written instruments. The written contracts, properly construed to give meaning to *all* the provisions, support ARCO's interpretation. ANR's hindsight "interpretations," clearly concocted only for purposes of this trial, simply do not comport with its own course of performance, the parties' course of dealing or the industry understanding.

Brief at 33 (emphasis in original). Appellant's contention is bottomed upon its own interpretation of the contracts, which we have rejected. It seems clear to us that the fact questions of whether the force majeure and royalty provisions of the con-

tracts excused the failure to comply with the take-or-pay provisions of the contracts were supported by the evidence. The failure of the jury to find that the take-or-pay provisions were not excused was not therefore against the great weight and preponderance of the evidence. Appellant's contention that the answer of zero damages is grossly inadequate is without merit since the jury declined to find liability. *Southern Pine Lumber Co. v. Andrade*, 132 Tex. 372, 124 S.W.2d 334 (1939); *Granado v. Madsen*, 729 S.W.2d 866 (Tex.App.— Houston [14th Dist.] 1987, writ ref'd n.r.e.). Appellant's fifth and sixth points are overruled.

■ In its seventh point of error appellant contends the trial court's instruction No. 1 was erroneous because it confined the jury's consideration of the contract terms to those listed in the contract "as written" and further that the instruction was a comment on the weight of the evidence. Appellant further contends that the court erred in refusing its requested instruction No. 2. The court's instruction No. 1, of which appellant complains, was:

> With respect to the following Special Issues, you may consider and apply all of the terms and provisions of the contracts as written, including provisions relating to daily contract quantities, dedication, the quantity clause, force majeure, reservation of seller ("royalty gas"), seller's deliverability, waiver, and warranty.

> You are further instructed that as to the terms set out herein, you are bound by the definitions of said terms contained in the contract.

Appellant's instruction No. 2, which the trial court refused, was:

> With respect to the following Special Issues, you may consider and apply all of the terms and provisions of the contracts, including provisions relating to daily contract quantities, dedication, the quantity clause, force majeure, reservation of seller, seller's deliverability, waiver, and warranty.

Thus the trial court restricted the jury to the terms and provisions of the contracts "as written," which forms the major basis for appellant's complaint.

Appellant argues that this instruction "precluded the jury's consideration of evidence other than the written contracts [and] imposed on ARCO an increased (and incorrect) burden to convince the jury of its interpretations based on the language of the contracts *alone.*" Brief at 36 (emphasis in original). Appellant further argues that "[a]ll of the evidence of course of performance favored ARCO's interpretations," but that "[b]y focusing the jury's attention solely on the contract terms *as written,* the trial court clearly indicated to the jury that *the court* rejected ARCO's interpretation and the evidence supporting that interpretation." *Id.* (emphasis in original).

The trial court construed these unambiguous contracts as a matter of law. TEX. BUS. & COM.CODE § 2.202 provides that terms set forth in a writing intended by the parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or of a contemporaneous agreement but may be supplemented or explained by course of dealing or usage of trade. Section 1.205 defines course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." The same section defines "usage of trade" as "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." It specifically provides that a "course of dealing" or "usage of trade" give particular meaning to and supplement or qualify terms of an agreement and that "the express terms of an agreement and an applicable course of dealing or usage of trade shall be construed whenever reasonable as consistent with each other, but when such construction is unreasonable express terms control both course of dealing and usage of trade ..." Thus, it seems clear to us that it was incumbent upon the trial court to restrict the jury's considera-

tion to the terms and conditions of the contracts as written. Appellant's seventh point is overruled.

Appellant contends in its eighth point of error that the trial court erred in refusing its requested instructions No. 1 on course of performance. Appellant makes no argument in support of the point; it is therefore overruled.

In its ninth point appellant contends that the trial court erred in giving instruction No. 2 because it was improper and a comment on the weight of the evidence. The complained-of instruction reads:

> You are instructed that a party claiming damages has a duty to take all reasonable steps to try to mitigate, reduce, and alleviate his claimed losses.

While we doubt this instruction was appropriate under the facts of this case, we cannot understand how reversible error was committed in view of the failure of the jury to find liability. The instruction concerned only the *amount* of damages, and without a finding of liability there could be no damages. Appellant's ninth point is overruled.

In its tenth point of error appellant contends the trial court erroneously included the term "royalty gas" in instruction No. 1, quoted above. Appellant argues that it is a comment on the weight of the evidence and "nudged" the jury to accept ANR's interpretation. We do not agree. Various witnesses, including some for ARCO, referred to the reservations clause as royalty gas. It was not reversible error for the court to refer additionally to the reservations of seller provisions of the contract as royalty gas. The tenth point of error is overruled.

Appellant's eleventh point of error contends the trial court's instruction No. 3 was not a proper instruction, was immaterial and irrelevant, was a comment on the weight of the evidence and over-emphasized ANR's notice theory. The complained-of instruction provides:

> You are instructed that a party has notice of those matters which a reasonable inquiry by that party would have disclosed.

The instruction was apparently given in connection with the daily contract option provision of the contract. It was ARCO's position that ANR could exercise this option only with notice to ARCO. We fail to understand, therefore, how appellant could be heard to object to an instruction thereon. We do not see how the giving of the instruction could amount to reversible error. The point is overruled.

Appellant's twelfth point of error contends the court erred in dividing the year 1985, in questions one through eight, into periods of time January 1, 1985 to May 31, 1985 and June 1, 1985 to December 31, 1985. Appellant argues this amounted to a comment on the weight of the evidence. We do not agree. It was undisputed that FERC Order No. 380, which appellee claimed amounted to force majeure, became effective on June 1, 1985. Force majeure, therefore, could not have affected any take-or-pay obligations prior to that date, but, if so found by the jury, could affect take-or-pay obligations thereafter. We see no vice in so framing the questions. This point of error is overruled.

Appellant's thirteenth point of error contends the trial court erred in excluding evidence that following the effective date of FERC Order No. 380 MichCon continued to make payments to ANR for demand payment charges. This evidence was developed outside the presence of the jury on a bill of exception and it shows that while the amount of the payments were substantial, the payments constituted partial payment for ANR's fixed costs of providing the physical capacity to meet MichCon's contract needs. We agree with appellee that this evidence was not relevant to the issue of whether force majeure resulted from Order No. 380 and whether it affected the takes of gas by MichCon. Likewise, ANR's profitability or its ability to pay under the take-or-pay provision was not relevant to the stated question. This point of error is overruled.

By its fourteenth point of error appellant contends the court erred in re-

fusing to excuse for cause two prospective jurors. Prospective juror Jones was in the midst of a divorce and her husband was represented by the law firm of Vinson & Elkins—the firm that represented appellant in the trial court. She swore she was not biased against the firm and stated she could decide the case fairly based on the evidence. The other prospective juror, Largent, was a gas contract analyst for Texas Eastern. While she stated she had knowledge about gas contracts, she likewise swore she would not favor one party over the other, could put her knowledge aside, follow the evidence fairly and follow the court's charge. There was no basis for disqualification of either prospective juror. Appellant's fourteenth point is overruled.

▅ In its fifteenth point of error appellant contends the court erred in overruling its motion for new trial based upon appellee's incurably prejudicial argument. As demonstrative aids for use during argument, appellee had several enlarged photographs of various of appellant's witnesses, taken from frames of videotaped depositions, with statements attributed to such witness noted on the exhibit. Appellant states "[t]hose posters forcefully imprinted on the minds of the jurors *the false notion that ARCO'S witnesses agreed with ANR'S positions on every issue at trial.*" Brief at 47 (emphasis in original). Appellant now argues:

> Some of the statements on the posters were alleged to have been made *in videotaped depositions* that were not even played for the jury at trial. Other statements were taken out of context so as to make it appear that the witness said one thing, when in fact the witness repeatedly said the opposite.

*Id.* The issue on the use of the photographs by appellee during its argument to the jury was inquired into in the absence of the jury before their attempted exhibition. Appellant did not offer any proof to the trial court supporting its present contention that the statement attributed to each witness was not based upon testimony. Nor did appellant request any limiting instruction from the court governing the

jury's use of the demonstrative aids. Under such circumstances we fail to find any error. *Standard Fire Insurance Co. v. Reese*, 584 S.W.2d 835 (Tex.1979). This point is overruled.

In its sixteenth point of error appellant contends the court erred in denying its motion for partial non-suit. Appellant has not briefed the point; it is therefore overruled.

Finally, appellant contends in its seventeenth point of error that because of the cumulative impact of errors a new trial is required in the interest of justice. Having held that none of the sixteen assigned errors individually required a reversal, we likewise find that collectively they do not. The point is overruled.

The judgment is affirmed.

J. CURTISS BROWN, Chief Justice.

I concur in the result only.

I give no effect to the jury verdict but would base my agreement to affirm upon rulings as a matter of law that (1) the "royalty" provision applies (2) the force majeure clause applies. Although incidental, I would also hold that the "option" provision does not apply as a matter of law in that it is "at Buyer's option" and hence is invoked only by some form of notice which was not given.

Since appellant concedes that it must be correct on all three major issues in order to recover under its damage testimony the success of appellant's attack on the "option to reduce the daily contract quantity" does not affect the judgment that should be entered. If it is necessary to rely upon the jury's findings on any question other than damages I do not agree with the court's holdings with reference to the jury instructions given and evidence rejected.

With respect to the "royalty" question the agreement provides that it excepts "such portion of the gas produced from the reservoirs subject to this Agreement *as Sellers lessor may be entitled to take or receive under the terms of Sellers leases....*" It is undisputed that the sellers lessor is the United States and under the

leases it was entitled to take royalty gas in kind. It is equally clear that as a matter of practice the government does not exercise this privilege. However, the agreement is clear that the royalty gas could have been taken, and thus, was excluded by the express terms of the agreement.

With respect to force majeure the contractual definition includes an express provisions bringing within it "... any act or omission, (*including failure to take gas*) of a purchaser of substantial quantities of gas from Buyer which is excused by any event or occurrence of the character herein defined as constituting force majeure, *and any laws, orders, rules, regulations, acts or restraints of any government or government body or authority, civil or military.*" As a matter of law FERC Order No. 380 falls within this provision. This conclusion is aided by Article V section 8 of the contract providing "Notwithstanding anything to the contrary contained herein, on any day when deliveries or takes are affected by force majeure and the volumes of gas well gas delivered are less than the applicable daily contract quantity, the daily contract quantity hereunder shall be deemed to be the actual volume delivered and purchased on each such day."

Application of my views would also result in an affirmance and I, therefore, concur in the result.