**Affirmed and Memorandum Opinion filed September 11, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00289-CV

### SHELL TRADING (US) COMPANY, Appellant

### V.

### LION OIL TRADING & TRANSPORTATION, INC., Appellee

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2009-11659A**

## MEMORANDUM OPINION

Appellant, Shell Trading (US) Company ("STUSCO"), appeals the summary judgment granted in favor of appellee, Lion Oil Trading & Transportation, Inc. ("LOTT"), on STUSCO's breach of contract claims against LOTT. We affirm.

### I. BACKGROUND

STUSCO and LOTT entered into numerous contracts known as buy-sell agreements between 2002 and September 2008. A buy-sell agreement is a contract in which two parties agree to buy and sell equal amounts of various grades of crude oil.

Under the buy-sell agreements, the parties may buy and sell the same grade of crude oil at different locations or buy and sell different grades of crude oil.

In September 2008, Hurricanes Gustav and Ike caused a significant amount of crude production in the Gulf of Mexico to be shut-in. When Hurricane Ike made landfall on the Texas coast, portions of the crude oil production and transportation infrastructure were severely impacted.

STUSCO and LOTT had entered into fourteen buy-sell agreements providing for the delivery of crude oil during September 2008. At issue in this appeal are the following four September 2008 buy-sell agreements:

- **Contract No. 123420**

  LOTT to buy 60,000 barrels of LLS[1] from STUSCO for $119.35 per barrel

  LOTT to sell 60,000 barrels of LLS to STUSCO for $119.00 per barrel

- **Contract No. 123272**

  LOTT to buy 90,000 barrels of LLS from STUSCO for $128.50 per barrel

  LOTT to sell 90,000 barrels of WTI[2] to STUSCO for $124.50 per barrel

- **Contract No. 123445**

  LOTT to buy 30,000 barrels of Bonito Sour[3] from STUSCO for $115.25 per barrel

  LOTT to sell 30,000 barrels of WTI to STUSCO for $116.50 per barrel

---

[1] "LLS" is Light Louisiana Sweet crude oil.

[2] "WTI" is West Texas Intermediate crude oil.

[3] "Bonito Sour" is Bonito Sour crude oil.

2

- **Contract No. 123553**

  LOTT to buy 39,000 barrels of Bonito Sour from STUSCO for $112.80 per barrel

  LOTT to sell 39,000 barrels of WTI to STUSCO for $114.00 per barrel

STUSCO did not deliver any crude oil under each of these four contracts. LOTT delivered its full obligation under contract nos. 123272, 123445, and 123553 because the WTI crude supplied by LOTT was not impacted by the hurricanes in the Gulf of Mexico. LOTT delivered all but 15,000 of 60,000 barrels of LLS under contract no. 123420.

LOTT wrote STUSCO on October 27, 2008, stating that STUSCO had not delivered or declared force majeure, and informed STUSCO that LOTT "had to purchase replacement barrels to keep the refinery in operation."[4] LOTT further advised STUSCO that it "[would] accept 'make-up' barrels at the Argus midpoint average for the month of delivery through January 31, 2009.[5] If you cannot deliver 'make-up' barrels at the aforesaid price by January 31, 2009, you are relieved of your contractual obligation to do so." Thus, LOTT would not accept delivery of those barrels at the September contract prices, but only at the lower market price.[6]

STUSCO responded on October 30, 2008, in relevant part, as follows:

STUSCO rejects LOTT's desire to change the agreed price and terms under these Contracts. Each of the Contracts provides for STUSCO to buy and sell crude oil to LOTT at a fixed price, and the Contracts do not provide for barrels to be priced in any other manner. In each of these contracts, STUSCO has included wording in the main body of the contract re-iterating the requirement to settle imbalances in the specified manner. Further, STUSCO has purchased and paid for volumes received under these buy/sell

---

[4] The refinery referenced in LOTT's October 27, 2008 letter is located in El Dorado, Arkansas, and is owned by LOTT's parent company, Lion Oil Company.

[5] The "Argus midpoint average" is a market-based price, not the contract price.

[6] The price per barrel of WTI was $95.16 on September 16, 2008, $120.92 on September 22, 2008, and $66.25 on October 22, 2008.

Contracts at the prices indicated in the Contracts, and expects LOTT to honor its contractual obligation to do the same.

In many instances where the parties have delivered make-up barrels in the past, the price paid was the fixed price provided in the contract. Had LOTT intended to enter into a transaction with STUSCO in which the terms of the standard imbalance clause would have been different, LOTT should have discussed their [sic] desire prior to entering into the Contracts. No such attempt was made.

Accordingly, STUSCO intends to deliver the 'make-up' barrels at the fixed price under each of the relevant Contracts and comply with all other terms and conditions. Nothing contained herein shall relieve LOTT of its obligations under each of the Contracts.

On October 31, 2008, LOTT "confirmed" that STUSCO would make the deliveries under the contracts, and that LOTT would pay the "Argus Month Average Price" for the month of actual delivery.

Each of the four contracts contains the following "balancing provision" as found in Section J of the contracts, addressing a party's "underdelivery" of barrels:

If volumes are exchanged, each party shall be responsible for maintaining the exchange in balance on a month-to-month basis, as near as pipeline or other transportation conditions will permit. In all events upon termination of this Agreement and after all monetary obligations under this Agreement have been satisfied, any volume imbalance existing at the conclusion of this agreement of less than 1,000 barrels will be declared in balance. Any volume imbalance of 1,000 or more, limited to the total contract volume, will be settled by the underdelivering party making delivery of the total volume imbalance in accordance with the delivery provisions of this Agreement applicable to the underdelivering party, unless mutually agreed to the contrary. The request to schedule all volume imbalances must be confirmed in writing by one party or both parties. Volume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed. Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed.

The parties dispute the meaning of the balancing provision in the contracts. STUSCO contends that the balancing provision was triggered here because it was an

4

"underdelivering party" on the four contracts subject to this appeal and, therefore, it was obligated to deliver make-up barrels to LOTT, while LOTT was required to accept STUSCO's make-up barrels at the contract price. LOTT, on the other hand, asserts that the balancing provision was not triggered because no volumes were "exchanged"; that is, STUSCO was not an "underdelivering party" because it did not deliver any volumes under the contracts.

STUSCO sued LOTT for breach of contract for LOTT's refusal to pay the fixed contract price for make-up barrels delivered under contract nos. 123272 and 123420, alleging that it had suffered damages in the amount of the difference between the fixed contract price set forth under these contracts and the price paid by LOTT.[7] STUSCO also sued LOTT for breach of contract for refusing to accept 69,000 make-up barrels at the fixed contract price under contract nos. 123445 and 123553, alleging that it had suffered damages in the amount of the difference between the fixed contract price set forth under these contracts and the price paid by the third party to whom STUSCO sold those 69,000 barrels. STUSCO further sought a declaratory judgment that (1) LOTT is required to accept all make-up barrels delivered at the contract price; (2) the September buy-sell agreements had not been modified and are fully enforceable as written; and (3) the September buy-sell agreements do not require any party to declare force majeure, do not permit one party to declare force majeure for the other party, and do not permit a party to declare force majeure unless that party is rendered unable to perform delivery obligations by way of the balancing provisions of the contracts.

LOTT filed a counterclaim against STUSCO for breach of contract, alleging that STUSCO had breached contract nos. 123272, 123420, 123445, and 123553, among other contracts, for failing to deliver under these contracts for the month of September 2008, failing to declare force majeure, and failing to timely balance under the balancing provision, even if it applied. LOTT also counterclaimed for breach of the duty of good

_____

[7] STUSCO also alleged that LOTT breached contract no. 123404 for refusing to pay the fixed contract price. However, STUSCO's claim for breach of contract no. 123404 is not part of this appeal.

faith and asserted a number of affirmative defenses. LOTT further sought a declaration of its rights and legal relationships under the September contracts for which neither party attempted delivery, specifically that (1) LOTT is not obligated to accept delivery from STUSCO in the future under those contracts at any price; and (2) all parties are relieved of any obligation or liability under those contracts.

LOTT moved for summary judgment on STUSCO's claims against LOTT on contract nos. 123272, 123420, 123445, and 123553, arguing that the balancing provision expressly applies only "[i]f volumes are exchanged," and no volumes were "exchanged" under these contracts because STUSCO never made delivery on these contracts in September 2008. Therefore, STUSCO could not invoke the balancing provision to compel LOTT to pay the September 2008 contract price for make-up deliveries in subsequent months in connection with these contracts.

On November 11, 2010, the trial court signed an amended order granting LOTT's motion for summary judgment on STUSCO's breach of contracts claims against LOTT on contract nos. 123272, 123420, 123445, and 123553.[8] On April 1, 2011, the trial court signed an amended order severing the claims on contact nos. 123272, 123420, 123445, and 123553 from the remaining claims, making the November 11, 2010 amended order

---

[8] LOTT also filed three other parts to its motion for summary judgment. Part I included only background and evidence. In Part II, LOTT asked the trial court to hold, as a matter of law, that STUSCO materially breached contract nos. 123420 and 123272 by failing to deliver under the disputed contracts and, therefore, LOTT's performance under the contracts was excused, including the obligation to accept make-up deliveries under the balancing provision. In Part III, LOTT argued that (1) STUSCO's claim for the breach of contract nos. 123445 and 123553 should fail even if the trial court found that balancing provision applied; (2) STUSCO had a duty to timely make up the balance with respect to those contracts; (3) STUSCO materially breached that duty; and (4) LOTT's performance was therefore excused. The trial court denied Parts II and III in the November 11, 2010 amended summary judgment order. Only the granting of Part IV on STUSCO's claims against LOTT on contract nos. 123272, 123420, 123445, and 123553, as severed from the remainder of the case, is before us in this appeal.

STUSCO moved for partial summary judgment that LOTT, as a matter of law, breached contract nos. 123420, 123404, and 123272. STUSCO also sought summary judgment on LOTT's affirmative defenses of novation and accord and satisfaction, and on LOTT's counterclaim for breach of the duty of good faith. On January 11, 2011, the trial court denied STUSCO's motion for partial summary judgment. The denial of STUSCO's motion for partial summary judgment is not before us in this appeal.

granting summary judgment on contract nos. 123272, 23420, 123445, and 123553 final and appealable. STUSCO appeals the trial court's order granting LOTT's motion for summary judgment on STUSCO's claims against LOTT.[9]

## II. SUMMARY JUDGMENT STANDARD OF REVIEW

We review the trial court's granting of a summary judgment de novo. *Ferguson v. Bldg. Materials Corp. of Am.*, 295 S.W.3d 642, 644 (Tex. 2009) (per curiam). To be entitled to summary judgment under Rule 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We take as true all evidence favorable to the nonmovant and resolve any doubt in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc.*, 289 S.W.3d at 848.

## III. ANALYSIS

STUSCO argues on appeal that the trial court erred by interpreting the balancing provision to require the actual exchange of volumes of crude oil by the parties.

Our primary concern when we construe a written contract is to ascertain the parties' true intent as expressed in the contract. *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (per curiam) (orig. proceeding); *Epps v. Fowler*, 351 S.W.3d 862, 865

---

[9] STUSCO argues that, because it has established that Section J was triggered and that STUSCO was obligated to deliver make-up barrels to LOTT, this court should not only reverse the summary judgment granted in LOTT's favor, but we should also render summary judgment that LOTT (1) breached, as a matter of law, contract nos. 123272, 123420, 123445, and 123553; and (2) is liable for the contract price on those contracts. We do not address the merits of STUSCO's motion for partial summary judgment that LOTT breached the contracts because we conclude, as addressed below, that the Section J balancing provision was not triggered. Moreover, STUSCO only sought partial summary judgment on two of the contracts that are the subject of this appeal. Again, the denial of STUSCO's motion for partial summary judgment is not part of this appeal.

7

(Tex. 2011). "We must examine and consider the entire writing 'in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam) (quoting *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005)). "We begin this analysis with the contract's express language." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). The construction of an unambiguous contract is a question of law for the court, which we consider under a de novo standard of review. *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011); *see also Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 214 (Tex. 2011) (op. on reh'g) ("Where an ambiguity has not been raised by the parties, the interpretation of a contract is a question of law.").

"A written contract must be construed to give effect to the parties' intent expressed in the text as understood in light of the facts and circumstances surrounding the contract's execution, subject to the parol evidence rule." *Houston Exploration Co. v. Wellington Underwriting Agencies, Ltd.*, 352 S.W.3d 462, 469 (Tex. 2011); *see also Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex. 1982) ("If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language."). However, "[o]nly where a contract is ambiguous may a court consider the parties' interpretation and 'admit extraneous evidence to determine the true meaning of the instrument.'" *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450–51 (Tex. 2008) (per curiam) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam)).

## A. The Meaning of "Exchange"

Both STUSCO and LOTT assert the language of Section J is unambiguous, although STUSCO contends alternatively that Section J is ambiguous. As addressed below, we conclude that the language of Section J is unambiguous, and it requires that both parties to the buy-sell agreements deliver volumes of crude oil before the provision applies to extend the delivery dates to cure any imbalance.[10]

STUSCO maintains that any underdelivery triggers Section J above so long as the underdelivery equals or exceeds 1,000 barrels of crude oil, even if the underdelivery amounts to the "total contract volume." LOTT, on the other hand, contends that the extended delivery period in Section J applies only when the parties "exchange" volumes. To "exchange" means to "part with, give, or transfer in consideration of something received as an equivalent." WEBSTER'S NINTH NEW YEAR COLLEGIATE DICTIONARY 432 (1983). Thus, according to LOTT, there is no exchange of volumes where one or both parties fail to deliver any volumes at all.

STUSCO responds that the Uniform Commercial Code ("UCC") "rejects . . . the 'lay dictionary' reading of a commercial agreement" and requires that the language must be read and interpreted in the light of commercial practices and other surrounding circumstances. TEX. BUS. & COM. CODE ANN. § 1.303 cmt. 1 (West 2009). STUSCO asserts that the commercial purpose of Section J is for the parties to stay "in balance" and to manage the price risk of crude oil, i.e., the risk that the price may drop in future months. STUSCO claims that, in practice, the parties never required mutual delivery of

---

[10] LOTT avers that STUSCO waived its argument that "exchange" means one party has delivered some barrels of crude oil by failing to raise it in the trial court. STUSCO responds that it raised this argument in the trial court. We do not decide whether STUSCO waived this argument because, as addressed below, we reject STUSCO's interpretation of Section J.

Moreover, we do not address LOTT's argument that STUSCO materially breached the four buy-sell agreements by not delivering any crude oil in September 2008, and that such breach relieved LOTT of any obligation to perform under the contracts. LOTT did not raise this argument in Part IV of its motion for summary judgment, but raised it as to contract nos. 123272 and 123420 in Part II. Not only did the trial court not include Part II in the severance, it *denied* the motion.

oil to trigger Section J's balancing provision and, throughout the course of the parties' relationship, both parties had delivered, accepted, and paid the contract price for make-up barrels of the "total contract volume."

Courts must construe a contract in light of its commercial context and examine the instrument as a whole to harmonize and give effect to all of its provisions. *See Houston Exploration Co.*, 352 S.W.3d at 469; *Valence Operating Co.*, 164 S.W.3d at 662. LOTT argues, however, the commercial purpose of the contracts is "the simultaneous trade of crude [oil] during a short timeframe." Therefore, according to LOTT, the balancing provision exists to provide for the likelihood that a party's delivery during the delivery period will not exactly match its obligation rather than for a party's failure to deliver any volumes of crude oil.

An interpretation of Section J requiring both parties to deliver volumes of crude oil before Section J can be triggered supports not only LOTT's asserted commercial purpose, but also STUSCO's stated commercial purposes. Managing the price risk and staying "in balance on a month-to-month basis" is more readily achieved by requiring the parties to exchange or deliver volumes of crude during the contract delivery month.

STUSCO further asserts that if the volume imbalance is between 1,000 barrels and the total contract amount, an "imbalance" occurs, and the "underdelivering party" is obligated to "settle" through the delivery of make-up barrels. STUSCO claims that any other construction renders meaningless the provision that the volume of make-up barrels can equal the "total contract volume."

LOTT responds that STUSCO's interpretation of "limited to total contract volume" renders the delivery period and the phrase "[i]f volumes are exchanged" superfluous. We agree. The phrase "limited to total contract volume" is a limitation on the amount of the imbalance that the underdelivering party must make up. Without such limitation, there would be no requirement that volumes be "exchanged," i.e., both parties deliver crude oil, before the imbalance is settled. Moreover, as LOTT points out, Section

J refers to the party who must make up the imbalance as the "underdelivering party," not the "non-delivering party."

Finally, STUSCO claims that "LOTT's reading of Section J would have the anomalous result that a party could unilaterally control the 'exchange' requirement, and thereby the triggering of Section J, by choosing to deliver (or not deliver) a barrel (or a teaspoon) of oil to the other party." According to STUSCO, such a reading of Section J "would give the parties too much opportunity for manipulation of the contracts," which is inconsistent with the purpose of managing the risk of price fluctuations. However, the buy-sell agreements require the parties to deliver the contract amount during the delivery period stated in the agreements. STUSCO's scenario involves a party purportedly manipulating buy-sell agreements by failing to deliver contract amounts. STUSCO's claims against LOTT on the four contracts at issue in this appeal are based on LOTT's refusal to accept make-up barrels on the total volume under the buy-sell agreements. LOTT is not the party who failed to deliver under the four contracts. Moreover, STUSCO's argument assumes that a party who attempts to manipulate the contracts by delivering only a "teaspoon" of oil would know in which direction the price of oil would move.

### B. Course of Dealing and Course of Performance

STUSCO seeks to supplement or explain the meaning of the phrase "[i]f volumes are exchanged" as found in Section J of the buy-sell agreements with evidence of the parties' course of dealing and course of performance under the UCC,[11] while LOTT

---

[11] *See* TEX. BUS. & COM. CODE ANN. § 2.202 (West 2009) ("Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented . . . by course of performance, course of dealing, or usage of trade (Section 1.303)[.]"). *But see Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 313 n.3 (Tex. 2005) (per curiam) ("Because the plain language of the contract is clear and supports [petitioner's] interpretation, we need not consider such evidence [of course of dealing, course of performance, and usage of trade] for explanatory purposes."); *Sw. Pipe Servs., Inc. v. Kinder Morgan, Inc.*, No. 14-09-00601-CV, 2010 WL 2649950, at *5 (Tex. App.—Houston [14th Dist.] July 6, 2010, no pet.) (mem. op.) ("Course of dealing

disputes that there is any course of dealing or course of performance between the parties.[12]

Section 1.303(b) of the UCC defines "course of dealing" as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." TEX. BUS. & COM. CODE ANN. § 1.303(b). Course of *dealing* is "restricted" to a sequence of conduct between the parties previous to the agreement. *Id.* § 1.303 cmt. 2. We consider evidence of these dealings between the parties on the assumption that that "course of prior dealings between the parties and the usages of trade were taken for granted when the document was phrased." *Id.* § 2.202 cmt. 2.

Evidence of a course of *performance*, by contrast, is considered because the course of actual performance by the parties should be "the best indication of what they intended the writing to mean." *Id.* With respect to "course of performance," section 1.303(a) provides:

A "course of performance" is a sequence of conduct between the parties to a particular transaction that exists if:

(1) the agreement of the parties with respect to the transaction involves repeated occasions for performance by a party; and

---

evidence is not considered when a contract is unambiguous."); *James L. Gang & Assocs., Inc. v. Abbott Labs., Inc.*, 198 S.W.3d 434, 437 (Tex. App.—Dallas 2006, no pet.) ("When a contract is unambiguous, a court does not consider course of dealing."); *Atl. Richfield Co. v. ANR Pipeline Co.*, 768 S.W.2d 777, 783–84 (Tex. App.—Houston [14th Dist.] 1989, no writ) ("The trial court construed these unambiguous contracts as a matter of law. . . . Thus, it seems clear to us that it was incumbent upon the trial court to restrict the jury's consideration to the terms and condition of the contracts as written.").

[12] LOTT urges that STUSCO waived these arguments by failing to raise them in the trial court: (1) the parties' course of performance shows that the balancing provision applies even when one party fails to deliver any volumes; and (2) the parties' course of dealing shows that the balancing provision applies when a party fails to deliver timely any volumes. STUSCO responds that it raised all of its arguments in the trial court. Because we disagree with STUSCO's position that the parties had a course of dealing or course of performance, we do not address whether STUSCO waived these arguments.

(2) the other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces without objection.

*Id.* § 1.303(a). A course of performance is a sequence of conduct after or under the agreement. *Id.* § 1.303 cmt. 2.

### 1. Course of Dealings (Prior Transactions)

STUSCO argues that the parties had a well-established course of dealing to manage underdeliveries causing a volume imbalance. STUSCO states that it did not deliver the full volume of crude oil during the delivery term under thirty-one contracts with LOTT between 2002 and August 2008. However, STUSCO identifies only two contracts with LOTT under which STUSCO did not deliver any barrels at all. Under these two contracts, both in 2005 following Hurricane Katrina, STUSCO made no timely delivery but LOTT accepted the late deliveries and paid the contract amount. We conclude that this evidence is insufficient to establish a prior course of dealing between the parties. The two instances, out of hundreds of contracts over several years, do not suggest that the parties took for granted in drafting the contract that the word "exchange" included exchange of zero product. *See Mann v. Trend Exploration Co.*, 934 S.W.2d 709, 713 (Tex. App.—El Paso 1996, writ denied) (holding that two transactions do not rise to the level of a course of dealing). Instead, "[i]t is the consistent acts of the parties, not the occasional variances, which create a course of dealing." *Jinnah v. Huntsville Wholesale Grocers, Inc.*, No. 10-05-00371-CV, 2007 WL 178516, at *2 (Tex. App.—Waco Jan. 24, 2007, no pet.) (mem. op.).

STUSCO further contends that the parties had a well-established prior course of dealing regarding when make-up barrels could be delivered. Section J provides that "[v]olume imbalances confirmed by the 20th of the month shall be delivered during the calendar month after the volume imbalance is confirmed. Volume imbalances confirmed after the 20th of the month shall be delivered during the second calendar month after the volume imbalance is confirmed." STUSCO argues that it had delivered make-up barrels

13

after the initial period of delivery identified in Section J on previous occasions. However, the issue here is STUSCO's failure to make any delivery under the four contracts at issue in this appeal, not whether make-up barrels were delivered within the time frame set forth in Section J. Again, evidence of the parties' dealings with regard to acceptance of make-up barrels is insufficient to supplement or explain the parties' assumptions regarding the meaning of the term "exchange."

## 2. Course of Performance (Transaction(s) at Issue)

STUSCO further relies on the parties' purported course of performance under the contracts as evidence of the meaning of the term "exchange." There is no question that STUSCO cannot rely upon the course of performance for the September buy-sell agreements individually. LOTT rejected make-up barrels at the contract price under each September buy-sell agreement at issue. However, STUSCO asserts that we should construe the "particular transaction" in this case for course of performance to be the parties' performance under the collective fourteen September buy-sell agreements.

First, STUSCO urges that the contracts should be viewed as a single transaction because of the language in the January 18, 2002 Net-Out agreement that each of the buy-sell agreements incorporates. The Net-Out agreement states the following, in relevant part: "Each month the parties shall mutually agree to the total value due each other for deliveries made in the preceding month, which deliveries shall be priced in accordance with the applicable contracts and/or divisions orders." Thus, under this argument, STUSCO maintains that we should view all of the September contracts, including the Net-Out agreement, to link the payment provisions in all of the September buy-sell agreements for financial "balancing."

Second, STUSCO contends that the parties themselves recognized the collective nature of the September buy-sell agreements by addressing them as a single transaction. STUSCO relies on two letters from LOTT dated October 27, 2008, and November 7, 2008, in which LOTT discussed make-up barrels without specifying any particular buy-

14

sell agreement.[13]   Therefore, according to STUSCO, "the parties' actual performance under all or any of the contracts in the overriding transaction, each with identical language and subject to a single Net-Out Agreement, is relevant to determine the meaning of the words used by the parties."

LOTT responds that the Net-Out agreement allows one party to pay the other party the net amount owed on multiple contracts between them at the end of the delivery month, but does not contain any terms other than payment terms.  LOTT avers that under STUSCO's argument, all of the hundreds of contracts between the parties over six years would be a "particular transaction" because they all incorporate the Net-Out agreement.

We conclude that the Net-Out agreement does not convert the fourteen September individual buy-sell agreements into a single transaction.  The Net-Out agreement merely provides terms for payment, not delivery of the different types and amounts of crude oil to be delivered under the individual buy-sell agreements.  Moreover, a review of the October 27, 2008 and November 7, 2008 letters does not reflect that LOTT viewed all fourteen of the September buy-sell agreements as one collective transaction.  To the contrary, on October 31, 2008, LOTT sent separate letters on the individual buy-sell agreements confirming the number of barrels that STUSCO was to deliver under the respective buy-sell agreements.

Even if we construed "all 14 September Buy-Sell Agreements [as] part of a single transaction 'involving repeated occasions for performance by a party' within the meaning of UCC § 1.303" as STUSCO urges, we would nonetheless conclude that the conduct of the parties is insufficient to establish a course of performance that supplements or explains the meaning of the term "exchange."   STUSCO's theory is that STUSCO

_____

[13] STUSCO cites to LOTT's October 27, 2008 letter to STUSCO, in which LOTT states that it "will accept 'make-up' barrels at the Argus midpoint average for the month of delivery through January 31, 2009."  STUSCO also relies on LOTT's November 7, 2008 letter to STUSCO regarding eight buy-sell agreements, including the four agreements at issue in this appeal, in which LOTT states that the failure to deliver would not qualify as an imbalance but an event of force majeure because STUSCO "delivered no barrels."

15

delivered the full contract volume in September 2008, under contract no. 123351, while LOTT made no delivery in September, but delivered in November 2008, for the contract price, which STUSCO paid. However, even if STUSCO is correct in its contention, the handling of a single make-up delivery under a single contract does not explain or supplement the parties' intentions regarding a failure to delivery any quantity. Instead, it is undisputed that LOTT refused to accept late deliveries under all four buy-sell agreements at issue here.

STUSCO also argues that LOTT's interpretation of Section J is inconsistent with LOTT's performance under contract no. 123420 because LOTT delivered 15,000 make-up barrels in November 2008, and invoiced the full contract price for those make-up barrels. However, STUSCO did not deliver any barrels under contract no. 123420, and LOTT refused to pay the contract price for STUSCO's late delivery of the volumes due under that contract. Therefore, LOTT's delivery of 15,000 make-up barrels under contract no. 123420 does not establish a course of performance that LOTT interpreted Section J as allowing a party to deliver the entire contract amount after the period of delivery had expired.

STUSCO further claims that LOTT never disputed that volumes had been "exchanged" within the meaning of Section J under the four contracts at issue in this appeal, but instead, confirmed that STUSCO was contractually obligated to deliver, and that LOTT was accepting, make-up barrels. However, the October 27, 2008 and October 31, 2008 letters from LOTT on which STUSCO relies clearly state that LOTT would accept "make-up barrels at the Argus midpoint average for the actual month of delivery." LOTT does not state that it would accept delivery of the volumes not delivered timely during September at the contract price.

We conclude that there is no evidence of a course of dealing or course of performance between STUSCO and LOTT with which to supplement or explain the interpretation of Section J.

16

## IV. CONCLUSION

In summary, we conclude that the buy-sell agreements unambiguously require each party to exchange, i.e., deliver, volumes of crude oil during the delivery period in order to trigger the application of the Section J balancing provision. Because STUSCO failed to make any delivery under contract nos. 123272, 123420, 123445, and 123553, Section J did not apply to extend the time for delivery of the full contract amount of barrels beyond the September 2008 delivery date.  The trial court did not err by granting LOTT's motion for summary judgment on STUSCO's breach of contract claims against LOTT on contract nos. 123272, 123420, 123445, and 123553.

Accordingly, we affirm the trial court's judgment.


/s/          Sharon McCally
                    Justice


Panel consists of Chief Justice Hedges and Justices Jamison and McCally.